**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| KENNETH WATKINS, }<br>}<br>    **Plaintiff,** }<br>}<br>v. }<br>}<br>CITY OF ADAMSVILLE, et al., }<br>}<br>    **Defendants.** } | **Case No.: 2:17-cv-00402-RDP** |

## MEMORANDUM OPINION

This case is before the court on the Motion for Summary Judgment filed by the City of Adamsville ("the City") and Gayle Phillips ("Phillips") (collectively, "Defendants"). (Doc. # 29). The Motion is fully briefed (Docs. # 29, 36, 45) and is ripe for review. After careful consideration, and for the reasons explained below, the court concludes that Defendants' Motion for Summary Judgment (Doc. # 29) is due to be granted in its entirety.

## I.     Factual Background[1]

This case involves the City's employment of Plaintiff Kenneth Watkins, an African-American male, from August 12, 2013 until his resignation on March 30, 2016. Proceeding under 42 U.S.C. § 1983, Plaintiff asserts that the City and Phillips, both in her individual and official capacities as Plaintiff's direct supervisor, subjected him to discrimination on the basis of his race in violation of 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

(Count One). (Doc. # 1 at ¶¶ 81-84). Additionally, Plaintiff claims that the City and Phillips discriminated him on the basis of his gender in violation of 42 U.S.C. § 1983 and the Equal Protection Clause (Count Three). (*Id*. at ¶¶ 90-103). Finally, Plaintiff argues that when he complained about the alleged disparate treatment, the City and Phillips retaliated against him in violation of the First and Fourteenth Amendments by treating him differently than white female employees and ultimately forcing his resignation. (Counts Two and Four). (*Id*. at ¶¶ 85-89, 104-108).[2]

The court begins its analysis by outlining the general structure of the jail and dispatch operations within the City's Police Department. Next, the court summarizes Plaintiff's performance evaluations during his training period. The court then details several events involving Plaintiff and his co-workers and/or supervisors that he characterizes as discriminatory and retaliatory. Finally, the court discusses the Rule 56 evidence regarding the two primary disciplinary events that led to Plaintiff's departure from his employment.

A.      **Structure of the City's Jail and Dispatch Operations**

On August 12, 2013, the City hired Plaintiff as a jailor and 911 dispatcher. (Doc. # 34-1 at 17, p. 55). Plaintiff's jailor duties included securing the male and female inmates in their separate facilities and ensuring they received their meals and recreational breaks. (*Id*.). As a dispatcher, Plaintiff answered 911 calls and transferred the calls to the proper agency. (*Id*. at 17, p. 56). All jailors employed by the City during this time were required to perform both sets of duties. (*Id*.).

---

[2] Plaintiff's Complaint indicates that he is suing Phillips in both her individual and official capacities. (Doc. # 1 at 1). However, the parties agree that any claims against Phillips in her official capacity are equivalent to claims against the City and are due to be dismissed. (Docs. # 29 at 18; 36 at 49). *See Hardy v. Town of Hayneville*, 50 F. Supp. 2d 1176, 1185 (M.D. Ala. 1999) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). Accordingly, and without objection, any official capacity claims against Phillips are dismissed. The court analyzes Plaintiff's claims against Phillips only in her individual capacity.

The City's Police Department includes the jail and dispatch operations. (Doc. # 29-2 at 4, p. 11). During Plaintiff's employment with the City, Robert Carter ("Chief Carter"), a white male, was the Chief of Police. (*Id*. at 3, p. 8). Chief Carter described the chain of authority within the City's Police Department from top to bottom as follows: Chief of Police, lieutenants, sergeants, then officers. (*Id*. at 3, p. 11). Chief Carter relied on the reports of Lynn Lindsey (Chief Carter's assistant) and Defendant Gayle Phillips (Jail and Dispatch Supervisor) (both white females) in supervising the daily operations of the jail and dispatch. (*Id*. at 3, pp. 11-12). Lindsey's position as Chief Carter's assistant was equivalent to a lieutenant rank, while Phillips acted as a sergeant. (*Id*. at 3, p. 12). Plaintiff's position as a jailor/dispatcher was equivalent to an officer's rank. (*Id*.). Based on this hierarchy, Phillips was Plaintiff's immediate supervisor. (Doc. # 34-1 at 17, p. 56).

Because Lindsey and Phillips oversaw the daily operation of the jail and dispatch, they handled most internal disciplinary matters and employee complaints without the intervention of Chief Carter. (Doc. # 29-2 at 4-5, pp. 12-13). If Lindsey and Phillips felt the matter was particularly serious, they would report it up the chain to Chief Carter. (*Id*.). They also needed Chief Carter's approval to suspend or terminate an employee. (*Id*. at 5, p. 14). So, while Lindsey and Phillips could strongly recommend that an employee be fired, the ultimate decision-making authority rested with Chief Carter. (Doc. # 29-4 at 24, p. 89).

When Plaintiff was initially hired, there were six female and four male jailor/dispatch employees. (*Id*. at 18, pp. 57-60).[3] The female employees included Phillips, Deirdre Lavies, Cindy Jackson, Lois Cunningham, Elizabeth Money, and Elizabeth Green. (*Id*. at 18, pp. 58-60). Shortly after Plaintiff began work, the City also hired Jana Jameson as another female jailor/dispatcher. (*Id*. at 18, p. 58). The male employees included Plaintiff, James Thomas, Joseph Burr, and Drew

---

[3] In addition to the employees listed here, the Rule 56 record includes references to two other white employees who worked with Plaintiff at various points during his employment: Leah Fields and Doug Blanchard.

Neal. (*Id*.). Plaintiff and Lois Cunningham were the only African-American jailor/dispatchers. (*Id*. at 19, pp. 62-63). In fact, Plaintiff testified that he and Cunningham were two of the only four African-American employees in the entire Police Department. (*Id*.).

### B.  Plaintiff's Initial Performance Evaluations

During Plaintiff's one-year training period, Lindsey and Phillips prepared two performance evaluations of Plaintiff. (Doc. # 29-6). On October 11, 2013, Lindsey noted (and Phillips agreed) that Plaintiff's performance was generally "acceptable," but he needed improvement in two areas: "acceptance of feedback" and "general demeanor." (*Id*. at 3-4). Specifically, Lindsey commented that Plaintiff's principal weakness was that he "gets a little argumentative with supervisors while training when corrected." (*Id*. at 5). His February 25, 2014 evaluation documented general improvement across the board. (*Id*. at 7-9). However, Lindsey advised Plaintiff to "use caution when shutting cell doors when inmates are present. No angry outbursts." (*Id*. at 9). This notation appears to reference an informal counseling session between Phillips and Plaintiff on January 7, 2014, when she counseled him on "his anger issues including slamming a jail cell door without regard to the safety of inmates" and his "inappropriate conversations with inmates." (Doc. # 29-7).

### C.  Employment Events Plaintiff Characterizes as Discriminatory and/or Retaliatory

Plaintiff argues that throughout his employment, Phillips and the City subjected him to numerous incidents of wrongful discriminatory and retaliatory treatment. Generally speaking, Plaintiff felt as though Phillips singled him out and talked down to him on a daily basis. (Doc. # 34-1 at 23, pp. 77-79). Several of Plaintiff's co-workers testified as to what they observed regarding Plaintiff's interactions with Phillips. For example, Lois Cunningham testified that at times, Phillips's tone while speaking to Plaintiff seemed "less pleasant" than when she spoke to

other employees. (Doc. # 34-15 at 9, p. 28). In her view, Phillips and Plaintiff did not always "get along." (*Id*. at 8, p. 25). Similarly, Cindy Jackson testified that Phillips was sometimes "rude" and "hateful" towards Plaintiff, but Phillips behaved "that way to a lot of people." (Doc. # 34-18 at 5, p. 11-12). In fact, Jackson also stated that Phillips spoke to Plaintiff the same way she spoke to female employees. (*Id*. at 5, p. 10). By contrast, Jana Jameson never observed an instance where Phillips demeaned Plaintiff or any other male employee. (Doc. # 29-15 at 7, p. 24).

In addition to Phillips's general behavior towards him, Plaintiff cites several specific events that occurred throughout his employment, which he characterizes as discriminatory and/or retaliatory. The court summarizes the Rule 56 evidence surrounding these events below.

### 1. Initial Shift Assignments

Part of Phillips's duties as the Jail and Dispatch Supervisor (and Plaintiff's immediate supervisor) included scheduling and managing jailor/dispatcher shifts. (Doc. # 29-4 at 4, p. 12). There were three shifts within the jail/dispatch department: 6:00 a.m. to 2:00 p.m. (first shift); 2:00 p.m. to 10:00 p.m. (second shift); and 10:00 p.m. to 6:00 a.m. (third shift). (*Id*.). Each shift required a minimum of two jailor/dispatchers on duty, with each respective employee assigned primarily either jailor or dispatcher duties for that particular shift. (*Id*.). Chief Carter preferred having one male jailor/dispatcher on each shift, particularly the first and second shifts, so that male and female inmates would feel more comfortable being searched and processed by jailors of their same sex. (*Id*. at 8-9, pp. 28-29). Phillips also considered hardships and seniority in scheduling shift assignments. (*Id*. at 9, pp. 29).

Plaintiff was initially trained on the first shift. (*Id*. at 7, pp. 21; 34-1; 34-1 at 19 at p. 61). Plaintiff testified that before his training period ended, sometime between August and November 2013, he asked Phillips to place him on the night shift because he had a second job. (Doc. # 34-1

at 20-21, p. 68). Phillips does not recall Plaintiff asking to be placed on the night shift. (Doc. # 29-4 at 6, p. 20). Without consulting Plaintiff about hardships, Phillips scheduled Plaintiff on the second shift, and assigned Jana Jameson, a less senior employee (by about two weeks), to the third shift. (*Id*. at 7, 9, pp. 21, 29). According to Plaintiff, Jameson had asked for the second shift. (Doc. # 34-1 at 20, p. 76). Phillips explained during her deposition that Plaintiff was likely assigned to the second shift due to Chief Carter's preference to have one male jailor/dispatcher working the first and second shifts. (Doc. # 29-4 at 9, p. 29). Plaintiff further testified that he overheard Phillips and Jameson giggling when Phillips showed Jameson the schedule. (Doc. # 34-1 at 21, pp. 69-71). Plaintiff did not hear them talking about him, but he thought they were laughing because Jameson was given the night shift that he requested. (*Id*.). Phillips and Jameson do not recall this incident. (Doc. # 29-4 at 8, p. 28; 29-15 at 9, pp. 31-32). Finally, Plaintiff never complained to Phillips or any other supervisor about not being assigned his shift of choice. (Doc. # 34-1 at 23, p. 77).

### 2.  January 2014 Book Incident Involving Elizabeth Money

On January 18, 2014, Elizabeth Money threw a book at Plaintiff's back while in the dispatch office during the second shift. (Doc. # 34-1 at 23-25, pp. 80-85; 34-10). Plaintiff immediately reported the incident to Phillips. (Doc. # 34-1 at 24, p. 81). Phillips prepared a report for Lindsey. (Doc. # 29-4 at 9, p. 32). Although Phillips testified that she verbally recommended termination as the penalty, Chief Carter recalled that Phillips's recommended penalty was suspension. With Chief Carter's approval, the City ultimately suspended Money from January 25, 2014 to January 28, 2014. (*Id*. at 9-10, pp. 32-33; 34-10; 29-2 at 5, pp. 13-14).

In Plaintiff's view, suspension was an inadequate punishment in light of a similar incident involving another white female employee, Deirdre Lavies. (Doc. # 34-1 at 25, pp. 86-88). Plaintiff testified that, sometime before Money threw the book at him, Lavies hit another white employee

on the back of the head and was terminated. (*Id*.). But, the Rule 56 evidence indicates that Phillips was never made aware of an incident involving Lavies hitting another employee. (Doc. # 29-4 at 13, p. 48). Instead, Chief Carter and Phillips confirmed that Lavies was fired because she made racist statements targeted at Lois Cunningham, a female African-American employee. (*Id*. at 14, p. 49; 29-2 at 7-8, pp. 24-27). Phillips recommended that the City fire her. (*Id*.).

Plaintiff also testified that Chief Carter questioned him in his office regarding the book incident. (Doc. # 34-1 at 64, pp. 243-244). According to Plaintiff, he told Carter that "it's kind of hard to be a male over [in the jail/dispatch department]." Carter denies that this conversation occurred. (Doc. # 29-2 at 14, p. 52). In fact, Carter testified that Plaintiff never complained to him about being treated differently due to his race or gender. (*Id*. at 13, p. 47). As Rule 56 caselaw requires, the court assumes the accuracy of Plaintiff's statement in this area.

When Money returned to work, she was placed on the third shift as a form of punishment for throwing a book at Plaintiff. (Doc. # 34-1 at 26, pp. 90-91; 29-4 at 15, p. 54). According to Plaintiff, in March 2014, Money complained about working the third shift and was reassigned to the second shift. (Doc. # 34-1 at 26, pp. 91-95). Plaintiff was then scheduled to the third shift. (*Id*. at 27, pp. 95-96). No City employee consulted him prior to implementing this schedule change. (*Id*.). At this point in Plaintiff's employment, working the night shift presented a problem because he had already arranged his schedule to accommodate his children. (*Id*.). However, while Plaintiff contends that he viewed this event as an indication that the needs of Money, a white female employee, were valued above his own, he never complained to his supervisors about it. (*Id*. at 28, pp. 99-100).

In addition to throwing a book at Plaintiff, Money was also written up, counselled, and/or disciplined for other work-related misconduct during her employment. For example, in January

2011, Money called in sick, but was spotted at a Walmart store picking up supplies for a party. (Doc. # 20). Phillips reported the incident to Lindsey, but the Rule 56 record does not indicate that Chief Carter was made aware of the issue or that any additional discipline was instituted against Money. (*Id*.). In November 2015, a civilian filed a complaint against Money claiming that she was rude and dismissive while performing dispatch duties. (*Id*.). Money's disciplinary record also includes several other disciplinary forms addressing such things as her failure to log dispatch calls, divulging confidential department information to the public, and sleeping on the job. (*Id*.). Although the Rule 56 record does not reflect when, Money was fired but subsequently reinstated after a hearing. (Doc. # 29-4 at 11-12, pp. 40-41).

### 3. Plaintiff's Night Shift

After Plaintiff was transferred to the third shift, Leah Fields, another white jailor/dispatcher, told Plaintiff that Phillips had asked her to keep an eye on him. (Doc. # 34-1 at 29, p. 101). Cunningham also testified that Jameson had told her that Phillips asked Jameson to watch Plaintiff. (*Id*. at 29, pp. 102-103; 34-15 at 10, p. 30). Phillips admitted that she asked Jameson to inform her if something happened during third shift that she should know about since she did not work that shift. (Doc. # 29-4 at 8, p. 27). But, she denied instructing any other jailor/dispatcher to specifically watch Plaintiff. (*Id*. at 8, pp. 26-27). (Again, the court treats Plaintiff's version as true for purposes of its Rule 56 analysis). Phillips never asked Plaintiff to monitor the shifts she was not working. (Doc. # 34-1 at 30, p. 105).

Plaintiff also testified that Fields and Jameson both behaved inappropriately while working the third shift. For example, Fields regularly slept on the job. (*Id*. at 73, p. 280). He claims Fields also had a sexual relationship with a male inmate. (*Id*. at 74, pp. 281-82). As a result, Chief Carter gave Fields a choice of termination or resignation, and she resigned her employment. (Doc. # 29-

2 at 9, pp. 30-31). Before Fields resigned, the male inmate with whom she had a sexual relationship committed suicide during Jameson's night shift. (Doc. # 34-1 at 74, p. 283). According to Plaintiff, Jameson gave him a pillow and blankets even though he exhibited signs of depression. (*Id*.). She also did not check on him for a period of 40 minutes, which was against policy at the time. (*Id*. at 35, pp. 127-28). Neither Phillips nor Chief Carter were present at the time of the inmate's death. (Docs. # 29-4 at 26, p. 98; 29-2 at 9-10, p. 32-35), so Jameson was not disciplined for giving blankets to an emotional inmate. (*Id*.).

### 4. March 2014 Memorandum

On March 13, 2014, three days after Plaintiff was moved to the third shift, Phillips gave Plaintiff a written memorandum outlining areas in which he could improve his job performance. (Doc. # 34-1 at 30-34; 29-4 at 17-18). The memorandum was based on several complaints Phillips had received from the female inmates. (Doc. # 29-4 at 19, p. 72). The memorandum reads as follows:

> Kenneth,
>
> I wanted you to know the criteria an inmate can file a grievance against a jailer—unfortunately some of your behavior I have heard about would fall under that.
>
> (1) Denying coffee to females for no reason while serving it to the males—coffee was mandated by the Mayor.
>
> (2) Waking up the females every time you go back there during the night—they were complaining you sing and whistle and hum and slam doors and that you talk on your phone all night. Kenneth they need to sleep, if you need to learn how to tell if they are breathing okay during night shift let me know.
>
> (3) We have to keep the jail office cool because of the equipment so please do not take the blankets from the females—if they disregard your orders then write them up.
>
> (4) 3:00 AM is a bit early to get the inmates up, chief wanted them to start between 4:00-4:30 AM.

(Doc. # 34-2 at 2). Phillips also attached a sample "Grievance Procedures Form" that inmates may file against jailors. (*Id.* at 3). The form provided a list of potential grounds for the initiation of a grievance. (*Id.*). Phillips had circled "Violation of civil rights" and "Unjust denial or restriction of inmate privileges" on the form. (*Id.*). Phillips left the memorandum for Plaintiff to find hanging off a desk in the dispatch office. (Doc. # 34-1 at 32, p. 114; 29-4 at 21-22 pp. 80-82). While Plaintiff insisted the document was left open, Phillips testified she "taped it up so nobody could open it." (Doc. # 29-4 at 22, p. 81).

Plaintiff disputed several of Phillips's criticisms. For example, Plaintiff testified that he actually gave the female inmates one cup of coffee that morning, but informed Phillips that they might need more because the coffee he gave them tasted strangely. (Doc. # 34-1 at 32, pp. 115-116). However, Phillips denied that any such conversation motivated the preparation of the memorandum. (Doc. # 29-4 at 20-21, pp. 75-77). Instead, she explained that her criticism was based on the female inmates' report that the male inmates received two cups of coffee when they only received one cup. (*Id.*). Furthermore, Plaintiff testified the reason he took blankets away from female inmates was because they refused to comply with his instruction to remove the blankets from their faces. (Doc. # 34-1 at 32, p. 114). Finally, Plaintiff stated that other female jailors made plenty of mistakes while on shift, but he never saw letters addressed to them in the dispatch office. (Doc. # 34-1 at 33-34, pp. 118-122). According to Plaintiff, they only received verbal feedback. (*Id.*). Although Plaintiff viewed this memorandum as a gender-motivated threat and an attempt to get him fired (Doc. # 34-1 at 33, p. 119), Phillips did not discipline Plaintiff beyond writing this memorandum. (*Id.* at 31, p. 111). She did not issue a formal write-up or attempt to fire Plaintiff. (*Id.*). By contrast, Phillips explained that because Plaintiff was not fully trained for the night shift, she wrote the memorandum with the intention of helping Plaintiff. (Doc. # 29-4 at 20, pp. 73-74).

Plaintiff discussed the memorandum with Phillips the following day, but he did not complain to any other City employee. (Doc. # 34-1 at 34, pp. 123-24).

### 5. Alleged Nepotism

Plaintiff asked Lindsey whether it was possible for family members to work within the department. (Doc. # 34-1 at 36-37, pp. 132-34). Plaintiff testified that Lindsey replied, "we're trying to get away from that." (*Id*. at 37, p. 133). There is no evidence in the Rule 56 record that a member of Plaintiff's family actually submitted an employment application to the City. Nevertheless, about one month after Plaintiff's conversation with Lindsey, the City hired Derrick Mills, a white male and stepson to Sergeant Nicks. (*Id*. at 37, p. 135).

Shortly thereafter, on July 22, 2015, Plaintiff asked Phillips if he could switch from the third shift to the first shift. (*Id*. at 38, p. 137; 34-22). Phillips responded no, because Derrick Mills and Sergeant Nicks were related and could not work together on the same shift. (*Id*. at 37-38, pp. 135-38; *Id*.; 29-4 at 28, p. 107). Plaintiff did not complain to any of his supervisors that Phillips refused his request to change shifts. (Doc. # 34-2 at 38, p. 138).

In fact, on August 20, 2015, Lindsey called Plaintiff and offered him the first shift. (*Id*.; 34-9). Plaintiff refused Lindsey's offer because he had already adjusted his children's babysitting arrangements to work the third shift. (*Id*.). However, Lindsey's memo documenting this conversation shows that Plaintiff "was given a choice to decide which shift he would like" beginning on August 31, 2015. (Doc. # 34-9).

### 6. June 2015 T-shirt Incident

On June 10, 2015, Mills hung a T-shirt in the dispatch bathroom that depicted Plaintiff as an inmate of the jail. (Docs. # 34-1 at 75, pp. 285-86; 34-4). Plaintiff told Mills that the T-shirt was not funny because he was the only African-American male employee, and the shirt implied

he was a criminal. (*Id*. at 75, p. 286). Phillips also saw the T-shirt and told Mills to put it away because it was inappropriate. (Doc. # 29-4 at 14-15, pp. 49-53). She did not, however, report the incident to Chief Carter or institute any further discipline against Mills. (*Id*.).

Additionally, Plaintiff testified that several police officers discussed the Trayvon Martin and Michael Brown shooting cases in his presence at the dispatch office. (Doc. # 34-1 at 78-79, pp. 300-301). Plaintiff stated that "[t]here was never any sympathy shown towards the victims," and the officers defended George Zimmerman, the person involved in one of the shootings. (*Id*. at 78, p. 300). Jameson, however, never heard co-workers talking about these shootings. (Doc. # 34-28 at 7, p. 16).

### 7. August 2015 Charges Against Female Inmate

In August 2015, a female inmate threw food at Plaintiff. (Doc. # 34-1 at 38-39, pp. 138-42). Plaintiff wanted to press charges against the inmate, but the charges were never entered in the system. (*Id*. at 39, p. 142). Both Phillips and Chief Carter testified that once an employee files a charge report, the magistrate judge determines "what they need to issue on or what they don't need to issue on [it]." (Docs. # 29-2 at 13-14, pp. 48, 51; 29-4 at 35, p. 134). In other words, their involvement ends once the magistrate judge screens the charges. (*Id*.). Again, Plaintiff did not complain to any of his supervisors about the charges not appearing in the system. (Doc. # 34-1 at 39, p. 142).

### 8. November 2015 Disagreement with Cunningham

During the November 2-3, 2015 night shift, Plaintiff and Cunningham had a disagreement about who would perform dispatch duties and who would make rounds in the jail. (Doc. # 34-1 at 61-62, pp. 231-36). Cunningham called Phillips to report the incident. (Doc. # 34-14) On

November 4, 2015, Phillips prepared the following memorandum documenting Cunningham's call:

> I received a call on my personal phone from dispatcher Lois Cunningham. This was around 12:30 a.m. on Tuesday, November 3, 2015. Ms. Cunningham said Dispatcher Kenneth Watkins was being aggressive towards her, speaking to her in "that voice." Ms. Cunningham had come to work before Mr. Watkins so Ms. Cunningham sat at the dispatch desk. Mr. Watkins came in and told her to move. She said no. He said "I'm not playing, move." She again said no. He said it once more aggressively the third time but she didn't relent. Ms. Cunningham said Mr. Watkins spent the rest of the time out in the shed in the dark. Ms. Cunningham said she wasn't afraid of him but did say he seems to be getting worse.

(Doc. # 34-14 at 3). Attached to Phillips's memorandum is a Disciplinary Action Form listing Phillips and Chief Carter as Plaintiff's supervisors. (*Id*. at 2). The form describes the incident as "insubordination" because Plaintiff said he would not work the jail and recommends termination as the next action step. (*Id*.). However, the Disciplinary Action Form is not dated or signed, and it does not indicate what type of disciplinary action was actually taken. (*Id*.). Phillips never confronted Plaintiff about the incident. (Doc. # 34-1 at 62, p. 233). In fact, Phillips denied preparing a write-up or instituting any further discipline against Plaintiff other than documenting Cunningham's call in the written memorandum quoted above. (Doc. # 29-4 at 27, p. 101).

Plaintiff testified that because of this document, Chief Carter summoned Plaintiff to his office and threatened to fire him. (Doc. # 34-1 at 61, pp. 232-33). Plaintiff asked him to review the video and logs from that evening, which showed that Plaintiff performed his rounds during that shift. (*Id*. at 61 at 233). To be sure, the log reveals that Plaintiff, employee number 808, worked the jail and checked on the inmates throughout the evening. (Doc. # 34-16). Because Plaintiff never heard from Chief Carter again, he assumed that Chief Carter reviewed the video and the logs and then dropped the issue. (Doc. # 34-1 at 62, p. 233). However, Chief Carter does not recall speaking

with Plaintiff about this incident or reviewing any video or logs from the night shift. (Doc. # 29-2 at 11, pp. 39-40).

### 9. January 2016 Rescinding Plaintiff's Discipline of an Inmate

In January 2016, Watkins approached an inmate and told her to remove a blanket from her face to make sure she was breathing properly. (Doc. # 34-1 at 42-43, pp. 153, 159). The inmate did not comply and continued to pull the blanket over her head. (*Id*. at 42, p. 153). As a result, Plaintiff took the blanket away, wrote the inmate up, and instituted a 24-hour lockdown disciplinary action. (*Id*.). On January 20, 2016, Phillips left Plaintiff a written message in the CAD input system notifying him of her decision to rescind the 24-hour lockdown. (Doc. # 34-8). The message read as follows:

> Kenneth, I read what you said on the disciplinary report. I watched video and spoke to her. Considering all avenues I put her on lockdown for less than 24 hours as well as my warning to her. I do have a concern when you approach a female who is asleep and then pull covers off of her without warning. If you have any questions you can ask me.

(*Id*.). Plaintiff did not complain to any of his supervisors that Phillips rescinded his disciplinary action. (Doc. # 34-1 at 44, pp. 161-62).

Although Plaintiff testified that other female jailor/dispatchers did not have their discipline of inmates rescinded (*Id*. at 43-44, pp. 160-61), Phillips explained that an employee's discipline action will be rescinded if they fail to follow protocol. (Doc. # 29-4 at 35, p. 133). For example, she recalled an instance where Green, a female jailor/dispatcher, imposed a lockdown which was later rescinded because she did not fill out the correct form. (*Id*. at 35, pp. 133-34).

### D. Primary Disciplinary Actions Leading to Plaintiff's Departure from the City

The Rule 56 record indicates that Plaintiff experienced only two formal disciplinary actions during his employment, both of which related to insubordination. The first did not result in any

tangible change to Plaintiff's employment; the second led to his termination/resignation. The court summarizes each of these events below.

### 1. October 2014 Laundry Incident

The City requires all jailor/dispatchers on each shift to do the laundry. (Docs. # 29-4 at 22, p. 84; 34-18 at 6, p. 14; 34-28 at 7, p. 19). Whatever laundry was left over from the prior shift would become the responsibility of the jailor/dispatchers working on the next shift. (Docs. # 34-18 at 6, p. 14; 34-28 at 7, p. 19). Generally, this system meant that the jailor/dispatchers working the third shift would do most of the laundry. (*Id*.). In fact, Plaintiff often walked in the laundry room to find clothes strewn all over the floor from prior shifts. (Doc. # 34-1 at 41, p. 150). But, neither Plaintiff nor several of his female co-workers recall an instance where another employee was reprimanded or written-up for failing to perform laundry duties. (Docs. # 34-1 at 76, p. 291; 34-18 at 6, pp. 14-15; 34-15 at 8, pp. 22-23; 34-28 at 7, p. 19).

On September 8, 2014, Phillips notified Plaintiff that although there was "plenty of blame to go around," he was not fulfilling his work obligations with respect to laundry duties. (Docs. # 29-4 at 31, p. 120; 29-10). She also warned Plaintiff that if he did not improve, a disciplinary write-up would follow. (Doc. # 29-10 at 2). When the issue did not improve, Phillips issued a written warning to Plaintiff on September 30, 2014. (Doc. # 29-10 at 4). The warning documents Plaintiff's explanation that he "hadn't gotten around to it." (*Id*.). Plaintiff also claimed that the washing equipment was broken. (Docs. # 34-1 at 41, p. 149; 29-10). Phillips listed suspension as the "next action step." (Doc. # 29-10 at 4). Plaintiff refused to sign the written warning because he thought it was "bogus." (*Id*.).

As to Plaintiff's contention that the washing equipment was broken, Phillips and several of Plaintiff's female co-workers confirmed that they experienced instances when they were unable

to do laundry because the washing machine was broken. (Docs. # 29-4 at 23, p. 85; 34-18 at 6, p. 14; 34-15 at 8, p. 22; 34-28 at 7, p. 19). However, Phillips testified that on the day she confronted Plaintiff about his failure to do the laundry, she "actually did the wash that morning, and it was not broken." (Doc. # 29-4 at 23, p. 85). Furthermore, the City did not replace the washing machine until June 2015, nearly nine months later. (Doc. # 29-11).

On October 1, 2014, Phillips attempted to discuss the laundry issue with Plaintiff. (*Id*. at 5). She perceived him as "disrespectful" and "argumentative" because he was "talking over" her. (Doc. # 29-4 at 22-23, pp. 85-88). Consequently, she prepared another disciplinary form listing suspension from September 30, 2014 to October 1, 2014 as her recommended punishment. (Doc. # 29-10 at 5). On the disciplinary form, she wrote that Plaintiff "became very argumentative and said it was bogus and that he did laundry whenever he worked the jail." (*Id*.). She also wrote, "Mr. Watkins was arguing with me to the point I had to tell him to be quiet for a moment so I could talk to him." (*Id*. at 6). Under the "Corrective Action Plan" section, Phillips suggested that Plaintiff "learn[] to control his arguing and listen[] to correction." (*Id*.). Additionally, she listed "further suspension" as the "next action step." (*Id*.). Below this section, Phillips noted that Plaintiff "was not given suspension was counseled by Chief Carter and myself on 10/1/2014." (*Id*.).

Chief Carter testified that he spoke with Plaintiff regarding the "insubordination" that Phillips reported. (Docs. # 29-2 at 13-14, pp. 48-49; 29-10 at 7). Chief Carter warned Plaintiff that if he continued to talk over superior officers, he would be fired. (Doc. # 29-2 at 14, p. 49). However, Chief Carter ultimately decided not to suspend Plaintiff (as Phillips recommended) because Plaintiff's brother had recently been killed. (*Id*. at 5, 13, pp. 19, 48). Instead, Chief Carter allowed him the opportunity to vent and reminded Plaintiff of his open-door policy. (*Id*. at 13-14, pp. 48-49). On October 2, 2014, Phillips prepared another disciplinary form documenting this

"informal" session of "verbal counseling." (Doc. # 29-10 at 7). Specifically, Phillips noted that she and Chief Carter "counseled Mr. Watkins on not arguing or talking over his supervisor and doing his duties more efficiently. Mr. Watkins was reminded that Chief has open-door policy." (*Id.*).

Although not documented in his disciplinary records, Plaintiff testified that he complained to Chief Carter for a second time that he did not know "what it's like being a male up in there, we're treated differently." (Doc. # 34-1 at 65, p. 247). Again, Carter denied that Plaintiff ever complained to him about being treated differently due to his race or gender, but the court resolves this dispute in Plaintiff's favor for purposes of this motion. (*Id.* at 13, p. 47).

### 2. March 2016 Refusal to Cover Cunningham's Night Shift

On Thursday, March 24, 2016, Lindsey informed Phillips that Cunningham required medical leave until Monday, March 28, 2016. (Doc. # 34-5 at 2). As a result, Phillips needed to schedule jailor/dispatchers to cover Cunningham's night shifts from Friday, March 25, 2016 to Sunday, March 27, 2016. (*Id.*; Doc. # 29-4 at 16, p. 58). Because Phillips was off-duty when she received Lindsey's message, she directed on-duty jailor/dispatchers, Money and Jameson, to make phone calls asking co-workers to cover the shifts. (Doc. # 34-5 at 2). Money and Jameson successfully rearranged the shifts on Friday and Sunday—Money agreed to work the second shift on Friday (her day off), and Jameson agreed to work the third shift on Friday and the second shift on Saturday. (*Id.*). Phillips also agreed to work a "turnaround" on Sunday, meaning that she would cover back-to-back shifts. (*Id.*). With Phillips's permission, Money planned to ask Plaintiff to work the remaining night shift on Saturday[4] since his usual days off were Friday and Saturday. (*Id.* at 2-3).

---

[4] There is conflicting evidence in the Rule 56 record as to whether the remaining shift was on Friday or Saturday night. The difference is not material for the purposes of the court's analysis. As discussed below, Plaintiff refused to cover the remaining night shift, whether that shift was on Friday or Saturday.

When Phillips arrived at work at 6:00 a.m. on Friday morning, Plaintiff had just finished his usual Thursday night shift. (*Id*.). The following exchange was captured on video in the dispatch office. (Doc. # 29-14). Phillips asked Plaintiff whether Money and/or Jameson had approached him about working the Saturday night shift. (*Id*.; 29-14 Video of Conversation). In the presence of another employee, Plaintiff immediately refused to cover the shift because he did not want to work six nights that week. (Doc. # 29-14). He talked over Phillips and repeatedly stated, "I'm not coming in on a Saturday night. It's not going to happen." (*Id*.). Phillips explained that she simply wanted Plaintiff to act like a "team player" and a "problem solver," instead of instantly refusing to help cover the shift. (*Id*.). Plaintiff then blamed Phillips and other employees for his unhappiness with his shift schedule, *i.e.*, working turnarounds for Phillips in the past and being denied his prior request to switch from the third shift to the first. (*Id*.). Towards the end of the conversation, Plaintiff offered to work an extra four hours on Sunday instead of covering the Saturday night shift. (*Id*.).

Phillips documented the incident in a handwritten memorandum entitled, "Group Two Offense—Gross Insubordination." (Doc. # 34-5 at 2). Phillips also recorded her recommendation that Plaintiff be fired through the following language:

> Due to Mr. Watkins obvious gross insubordination, his refusing to work, his slanderous accusations that I intended to hire Derrick Mills so Mr. Watkins couldn't be moved to 1st shift, his undermining my authority by verbally attacking me in front of my subordinate and accusing me slanderously of keeping him off 1st shift and implying that I didn't have the authority to tell him he couldn't work 1st shift, his obvious paranoia that two white women have been sabotaging his job at Adamsville, Mr. Watkins is obviously unstable and should not be allowed to work in this environment, my very strong recommendation is termination of employment.

(*Id*. at 4). Phillips gave the memorandum to Lindsey. (Doc. # 29-4 at 34, p. 130).

Shortly after, Lindsey called Plaintiff at home to inform him that Chief Carter wished to speak to him at the station. (Doc. # 34-1 at 46, pp. 171-72). During the conversation, Chief Carter discussed Plaintiff's conduct toward Phillips. (*Id*. at 52, pp. 193-94; 29-2 at 14, pp. 49-50). He testified and executed an affidavit confirming that he reviewed the video of Plaintiff's conversation with Phillips and determined that Plaintiff was "confrontational, disrespectful, and insubordinate to his supervisor." (Docs. # 29-2 at 13, pp. 46-47; 45-1 at 3). As a result, Chief Carter gave Plaintiff the choice of either resignation or termination. (Doc. # 34-1 at 51, pp. 191-92). Plaintiff testified that he did not draft his letter of resignation, nor was he given time to consult with his family or an attorney. (*Id*. at 66, pp. 250-52).

Additionally, Plaintiff testified that during this meeting, he again voiced his concerns that he had been discriminated against on the basis of his gender. (*Id*. at 66, pp. 250-52). But, as noted above, Chief Carter does not recall Plaintiff ever complaining that he had been discriminated against due to his race or gender. (Doc. # 29-2 at 13, p. 47).

On November 29, 2016, Plaintiff went to City Hall to retrieve a copy of a letter outlining the reason for his termination. (Doc. # 34-1 at 52, pp. 195-96). Plaintiff believed that the City's Human Resources Officer, Janet Gardner, called the police to supervise the visit because an officer suddenly appeared. (*Id*.). However, Plaintiff admitted that Gardner did not tell him she called the police, he did not hear Gardner call the police, and he did not interact with the police at any time during the visit. (*Id*. at 52-53, pp. 196-198). Furthermore, the police station is located across the street from City Hall. (*Id*. at 53, p. 198).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere

allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III. Analysis

After careful review, and for the reasons explained below, the court concludes that Defendants are entitled to summary judgment on all of Plaintiff's claims.

### A. Defendants Are Entitled to Summary Judgment on Plaintiff's Race and Gender Discrimination Claims

The Eleventh Circuit has held that Section 1983 "is a vehicle for bringing civil lawsuits that provides every person with the right to sue those acting under color of state law for violations of federal constitutional and statutory provisions." *Bush v. Houston Cty. Comm'n*, 414 F. Appx

264, 266 (11th Cir. 2011) (internal quotations omitted). Indeed, the Equal Protection Clause of the Fourteenth Amendment prohibits intentional race and gender discrimination in public employment. *Id.* (citing *Williams v. Consolidated City of Jacksonville,* 341 F.3d 1261, 1269 (11th Cir.2003); *Cross v. State of Ala.,* 49 F.3d 1490, 1507 (11th Cir.1995)). Section 1981 also prohibits "intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 471 (11th Cir. 1999). But, Section 1981 "does not provide an implicit cause of action against state actors." *Bryant v. Jones*, 575 F.3d 1281, 1288 n. 1 (11th Cir. 2009) (citing *Butts v. County of Volusia*, 222 F.3d 391, 394-95 (11th Cir. 2000)). Instead, Section 1983 "constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981." *Id.*

In the employment context, discrimination claims brought under the Equal Protection Clause, Section 1981, and Section 1983 are subject to the same elements of proof and analytical framework as Title VII claims. *Bush*, 414 F. Appx at 266. Discrimination claims may be "categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). In this case, because it is unclear whether Plaintiff alleges mixed-motive race and gender discrimination claims or both mixed-motive and single-motive claims, the court separately examines Plaintiff's allegations under each theory.

### i. Plaintiff's Single-Motive Discrimination Claims Fail as a Matter of Law

Where a discrimination claim relies on circumstantial evidence[5] (as is the case here), a plaintiff may meet his burden by satisfying the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff first has the

---

[5] When claims are based on circumstantial evidence, the evidence "suggests, but does not prove, a discriminatory motive." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004). By contrast, direct evidence is evidence proving, without inference, that illegal reasons motivated the adverse employment action. *Id.*

burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *Id*. Once a plaintiff has presented a *prima facie* case (and, thereby, has raised the presumption of discrimination), the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id*. If the employer satisfies that burden by articulating such a reason, then the presumption of discrimination falls away and the burden again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. *Id*. at 1326. If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason, but must meet it head on and rebut it. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Id.* at 1024-25.

To establish a *prima facie* case of discrimination, a plaintiff must show: "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003). Here, the majority of the parties' *prima facie* arguments revolve around the third and fourth prongs of the test. This is not surprising. Plaintiff is a member of a protected class, and he worked the jailor/dispatcher position before his employment ended. The court focuses on these third and fourth prong arguments and, for the reasons explained below, concludes that Plaintiff has failed to establish a *prima facie* case of race and gender discrimination.

### 1. Adverse Employment Action

Defendants concede that Plaintiff's termination/resignation from the City constitutes an adverse employment action.[6] (Docs. # 29 at 18; 45 at 18). But, they argue that Plaintiff's other non-termination discrimination claims do not. The court addresses Plaintiff's non-discharge adverse employment action assertions below.

In addition to his termination/resignation from the City, Plaintiff argues that the following actions of Phillips and the City, viewed cumulatively, constitute an adverse employment action:

- Phillips initially assigning Plaintiff to the second shift due to Chief Carter's preference to have at least one male working the first and second shifts.

- Phillips reassigning Plaintiff to the third shift after Money asked to switch shifts following the book-throwing incident.

- Phillips's alleged instruction to Fields and Jameson to watch Plaintiff on the third shift.

- Phillips's March 2014 memorandum outlining problem areas in Plaintiff's job performance during the night shift.

- Phillips's "insubordination" memo following Cunningham's report that he did not perform his jailor duties during the November 2, 2015-November 3, 2015 night shift.

- Phillips's report to Chief Carter that Plaintiff was insubordinate following his failure to do the laundry, even though according to Plaintiff, it was impossible to do the laundry because the machine was broken.

- The City's maintenance of "false write ups in his personnel file after documented evidence of being false."

- Phillips's report to Chief Carter that Plaintiff was insubordinate when he refused to cover Cunningham's Saturday, March 26, 2016 night shift, even though he offered to work an extra four hours during another shift.

- The City's alleged failure to enter into the system Plaintiff's charges against the female inmate that threw food at him.

- Phillips's decision to rescind Plaintiff's 24-hour lockdown of an inmate.

---

[6] Because Defendants have not asserted that Plaintiff's departure from the City was voluntary, the court assumes that Plaintiff's resignation amounts to an adverse employment action.

- Phillips's failure to discipline Mills further for hanging the T-shirt displaying Plaintiff's face and the word "inmate."

- Lindsey informing Plaintiff that the City was "trying to get away from [hiring family members]."

(Doc. # 36 at 29-30).

As an initial matter, Plaintiff's assertion that an employer's allegedly adverse actions should be considered cumulatively is off the mark. In support of this argument, Plaintiff relies solely on *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998), which considered whether Title VII's protection against *retaliation* extends to adverse actions that fall short of ultimate employment decisions. *Id.* at 1456. But, the standard for what constitutes an adverse employment action in the discrimination context differs from the standard applied in the retaliation context. *See Mills v. Cellco P'ship*, 376 F. Supp. 3d 1228, 1244 (N.D. Ala. 2019) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Here, for purposes of Plaintiff's race and gender discrimination claims, the controlling standard is whether the employer's action "impact[ed] the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001).

Indeed, the Eleventh Circuit has made clear that with regard to discrimination claims, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis*, 245 F.3d at 1239. "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (quoting *Gupta v. Florida. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (internal quotations omitted). More specifically, an

employee must show "a *serious and material* change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239 (emphasis in original). While "[e]vidence of direct economic consequences" is not always required to establish an adverse employment action, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id*. "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id*.

Simply put and in the words of Defendants, the list of incidents cited by Plaintiff amounts to little more than "unextraordinary disagreements with co-workers and supervisors regarding scheduling, work duties, and complying with supervisor's instructions." (Doc. # 29 at 19). Plaintiff's subjective view that these incidents were unfair or unwarranted does not in itself convert them into actionable adverse employment actions. *Davis*, 245 F.3d at 1239. To be clear, Phillips's report to Chief Carter that Plaintiff was insubordinate when he refused to cover Cunningham's night shift directly resulted in his termination/resignation from the City. But, outside of this report and the actual termination/resignation, there is no evidence in the Rule 56 record that these other events led to a reduction in pay, a loss of benefits, a work suspension, a demotion, or any other similar deprivation of an employment opportunity.

Two categories of employment actions contained in Plaintiff's list warrant further discussion. First, Plaintiff did not suffer an adverse employment action when Phillips (1) did not initially assign him to the third shift as he requested[7] and (2) reassigned him to the third shift when

---

[7] Although Phillips testified that Plaintiff was likely assigned to the second shift due to Chief Carter's preference to have one male jailor/dispatcher working the first and second shifts (Doc. # 29-4 at 9, p. 29), she also explained that Chief Carter wanted the female and male inmates to feel more comfortable being searched and processed by a jailor of their own sex. (*Id*. at 8-9, pp. 28-29). This explanation, therefore, does not suggest a *discriminatory* gender-based motive to assign Plaintiff to a different shift than the shift he requested.

another employee asked to change shifts. There is no evidence in the Rule 56 record that the three shifts differed with respect to salary, job conditions, or employment opportunities. Thus, Plaintiff's shift assignments did not negatively affect his compensation or the terms, conditions, or privileges of his employment.[8] Because the shift assignments did not have a tangible adverse effect on his employment, Plaintiff's disappointment in not working the shift that was most convenient for him does not qualify as an adverse employment action.

Second, written or verbal criticisms of an employee's job performance that do not lead to tangible job consequences are insufficient to constitute an adverse employment action. *Davis*, 245 F.3d at 1241. The following actions fall within the scope of a supervisor's appropriate criticism to a subordinate: (1) Phillips's March 2014 memorandum to Plaintiff outlining problem areas in his job performance during the night shift; (2) Phillips's "insubordination" write-up following Cunningham's report that he did not perform his jailor duties during the November 2, 2015-November 3, 2015 night shift; and (3) Phillips's CAD message notifying Plaintiff of her decision to rescind his 24-hour lockdown of an inmate. There is no Rule 56 evidence indicating that these events resulted in *any* negative job consequences for Plaintiff. In fact, Phillips did not report any of these events up the chain to Chief Carter, who possessed the ultimate authority to suspend or fire an employee. (Docs. # 29-2 at 5, p. 14; 29-4 at 24, p. 89). Furthermore, the fact that this information was maintained in Plaintiff's personnel file does not sway the court's analysis because "[e]mployer criticism, like employer praise, is an ordinary and appropriate feature of the workplace." *Davis*, 245 F.3d at 1242.

On the other hand, Phillips's report to Chief Carter that Plaintiff was insubordinate following his failure to do the laundry is a closer question. This is because Phillips's report (at the

---

[8] Moreover, other white female employees were not always assigned the shifts they wanted. (Doc. # 34-1 at 20, p. 26). Additionally, in August 2015, Lindsey offered Plaintiff his choice of shifts. (Doc. # 34-9).

very least) resulted in a formal meeting with Chief Carter, who possessed the authority to implement serious and material disciplinary measures. However, Chief Carter ultimately decided not to suspend Plaintiff, notwithstanding Phillips's recommendation. (Doc. # 29-2 at 5, 13, pp. 19, 48). Instead, Chief Carter allowed Plaintiff an opportunity to vent because Plaintiff's brother had recently passed away. (*Id*. at 13-14, pp. 48-49). There is no Rule 56 evidence suggesting that Plaintiff suffered any employment consequences beyond this conversation with Chief Carter. As such, the court concludes that Phillips's report does not constitute an adverse employment action. *See Summerlin v. M & H Valve Co.*, 167 F. Appx. 93, 97 (11th Cir. 2006) ("The reprimand of an employee does not constitute an adverse employment action when the employee suffers no tangible harm as a result.").

In any event, because Defendants have conceded that Plaintiff suffered an adverse employment action via his termination/resignation from the City, Plaintiff has satisfied the third element of his *prima facie* case.

### 2. Rule 56 Evidence of Similarly Situated Employees[9]

The court next addresses the fourth prong of the *McDonnell Douglas* framework. A plaintiff must show that his employer treated similarly situated employees outside his protected class -- "comparators" -- more favorably. *Wood v. K-Mart Corp.*, 273 Fed. Appx. 806, 807 (11th Cir. 2008). As the Eleventh Circuit recently clarified, to be a valid comparator, an employee must be similarly situated "in all material respects," but need not be "nearly identical" to the plaintiff. *Lewis*, 918 F.3d at 1218-19. In determining whether a comparator is similarly situated "in all

---

[9] Although both parties rely on the *McDonnell Douglas* framework at various points in their briefing (Docs. # 29 at 16-17; 36 at 35-35), neither party discusses whether similarly situated employees exist for the purposes of Plaintiff's race or gender discrimination claims. Nevertheless, the court has carefully examined the Rule 56 record to parse out potential comparator evidence, even though this should be the job of counsel, not the court. Counsel are cautioned that in the future, another court (or this one) may not endeavor to fill the gaps in counsel's briefing as the court has done here.

material aspects" to the plaintiff, courts consider whether a comparator: (1) engaged in the same basic conduct or misconduct as the plaintiff; (2) was subject to the same employment policies and guidelines as the plaintiff; (3) was under the jurisdiction of the same supervisor as the plaintiff; and (4) shared the plaintiff's experience and disciplinary history. *Id*. at 1227-28; *see also Davis v. Dunn Const. Co.*, 872 F. Supp. 2d 1291, 1310 (N.D. Ala. 2012); *Gaines v. Johnson*, 44 F. Supp. 3d 1169, 1178 (N.D. Ala. 2014).

The crux of Plaintiff's claims is that other white female jailor/dispatchers were treated more favorably in that they were not disciplined to the same degree or forced to resign following similar or worse misconduct. The second and third factors appear to be met here. Plaintiff and the white female employees at issue (Lavies, Money, Fields, Jameson, and Jackson) all had the same jailor/dispatcher position with the same job duties and were all under the jurisdiction of the same supervisors—Phillips and Lindsey (who both had the authority to recommend suspension and termination) and Chief Carter (who had the authority to implement suspension and termination). (Docs. # 29-2 at 5, p. 14; 29-4 at 24, p. 89). There is nothing in the Rule 56 record to suggest that any employee had more or fewer responsibilities than the others. But, Plaintiff's comparator arguments enjoy no other success.

Having concluded that the only actionable adverse employment action Plaintiff suffered was his termination/resignation from the City following Phillips's report of insubordination, the court's comparator analysis is limited to those employees who may have committed similar acts of insubordination or other misconduct and were not disciplined to the same degree or forced to resign (if any such employees exist).[10] After carefully examining the Rule 56 record, the court has

_____

[10] Regarding Phillips's report of Plaintiff's insubordination following the laundry incident, Plaintiff asserts that other white female employees also failed to complete their laundry duties but did not receive a write-up or any other discipline. Even accepting Plaintiff's assertion as true, the court has already determined that write-ups, reprimands, and other forms of employer criticism that did not have a tangible effect on Plaintiff's employment do

identified three white female employees with employment histories involving misconduct: Dierdre Lavies, Elizabeth Money, and Leah Fields. However, for the reasons explained below, these white female employees are not appropriate comparators because (1) they are not similarly situated to Plaintiff in that they did not engage in the same basic misconduct and (2) even if they had committed similar acts of insubordination, they were not treated more favorably because they were all disciplined or terminated following their misconduct.

Beginning with Lavies, the Rule 56 evidence shows that Lavies was terminated after making inappropriate racial statements to Lois Cunningham, a female African-American jailor/dispatcher. (Doc. # 29-4 at 14, p. 49; 29-2 at 7-8, pp. 24-27). Contrary to Plaintiff's belief, both Phillips and Chief Carter confirmed that she was not fired for hitting a white employee. (*Id*.).[11] While Lavies statements certainly qualify as reprehensible misconduct, she did not engage in "the same basic misconduct" as Plaintiff because she was not insubordinate to a supervisor. *See Lewis*, 918 F.3d at 1227-28. Thus, she is not a proper comparator for purposes of Plaintiff's race and gender discrimination claims. Even so, Lavies was not treated more favorably than Plaintiff because she was fired as a result of her misconduct.

Likewise, Money is not a proper comparator for Plaintiff. The Rule 56 record indicates that the City hired Money in 2009, at least four years before it hired Plaintiff. (Doc. # 20). During Money's lengthy employment, she was written up, counselled, and/or disciplined for various instances of work-related misconduct. Crucially, Money's disciplinary record shows that in 2010,

---

not constitute a tangible employment action for the purposes of Plaintiff's single-motive race and gender discrimination claims. Thus, the court has limited its comparator analysis accordingly.

[11] Furthermore, Plaintiff's assertion that Money received a lighter punishment after throwing the book at Plaintiff because he is an African-American male, whereas Lavies, who hit a white employee, was fired is off the mark. (Doc. # 34-1 at 25, pp. 86-88). The undisputed record evidence (as opposed to Plaintiff's rank speculation) indicates that Lavies was fired after making racial comments to a female African-American employee, not hitting a white employee. (Doc. # 29-4 at 14, p. 49; 29-2 at 7-8, pp. 24-27).

she was disciplined and ultimately fired for committing several "Group Two Offenses" including failing to log dispatch calls and sleeping on the job. (*Id.*). Money's employment was subsequently reinstated after a hearing, though the Rule 56 record does not indicate when. (Doc. # 29-4 at 11-12, pp. 40-41). As Phillips noted in her memorandum recommending Plaintiff's termination, gross insubordination is also a "Group Two Offense." (Doc. # 29-14 at 2). Although Money was not insubordinate to her supervisors, she was fired for committing two different Group Two Offenses. So, even assuming that Money engaged in the same basic misconduct as Plaintiff, *Lewis*, 918 F.3d at 1227-28, she was not treated more favorably.

Money's disciplinary record also contains other write-ups and verbal counseling forms related to less severe misconduct (such as being rude to civilians and divulging private case information outside of the department.) (Doc. # 20). Notably, on January 18, 2014, Elizabeth Money threw a book at Plaintiff's back while in the dispatch office during the second shift. (Doc. # 34-1 at 23-25, pp. 80-85; 34-10). With Chief Carter's approval, the City ultimately suspended Money from January 25, 2014 to January 28, 2014. (Doc. # 29-4 at 9-10, pp. 32-33; 34-10; 29-2 at 5, pp. 13-14). These additional events do not involve Money being insubordinate to a supervisor. And, the Rule 56 record does not suggest that throwing a book at a coworker constitutes a Group Two Offense, rendering termination the appropriate disciplinary measure. Nevertheless, the City did not treat Money more favorably than Plaintiff—she was suspended. That is, Chief Carter disciplined her appropriately for an offense that the summary judgement evidence indicates was less severe than a Group Two Offense.

Finally, it is undisputed that Fields had a sexual relationship with a male inmate who eventually committed suicide; consequently, the City gave her a choice between resignation and termination. (Doc. # 29-2 at 9, pp. 30-31). Again, not only did Fields engage in a different type of

misconduct than Plaintiff, but she was given the same choice between resignation and termination that Plaintiff was given. Because Plaintiff has failed to show the existence of a similarly situated employee who was treated more favorably, he has not established a *prima facie* case of race or gender discrimination under the *McDonnell Douglas* framework. Consequently, summary judgment is appropriate on Plaintiff's single-motive race and gender discrimination claims. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

### 3. Plaintiff Has Failed to Establish Pretext

Even assuming Plaintiff could establish a *prima facie* case of race and gender discrimination (and, to be clear, he cannot), Defendants' Motions are due to be granted on his single-motive discrimination claims for a separate reason: he cannot show that the reason Defendants have articulated for his termination/resignation from the City is a pretext for discrimination.

Again, once a *prima facie* case is established, an employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Wilson*, 376 F.3d at 1087. Analysis of whether the employer has met this burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993), and has been characterized as "exceedingly light," *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). After an employer articulates one or more legitimate, nondiscriminatory reasons for the employment action, a plaintiff must show that the proffered reason was a pretext for illegal discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot simply recast the reason, but must "meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030. "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding

whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Id.* at 1024-25.

Defendants argue that, even if Plaintiff had established a *prima facie* case, the City had a legitimate, nondiscriminatory reason to end Plaintiff's employment—his insubordination to Phillips, his supervisor, when he refused to cover a co-worker's night shift, as captured on video. (Doc. # 29 at 20). Insubordination is obviously a legitimate, nondiscriminatory reason which might motivate a reasonable employer to fire an employee. *See Veasy v. Sheriff of Palm Beach Cty.*, 746 F. Appx. 816, 819 (11th Cir. 2018) (concluding that employer demonstrated a legitimate, nondiscriminatory reason for firing employee where employer identified "a long line of insubordination offenses"). The court therefore must determine whether Plaintiff has presented evidence to create a triable issue of fact regarding pretext. He has not.

The court readily finds that the City's proffered reason for ending Plaintiff's employment is supported by undisputed facts in the Rule 56 record. Indeed, the video recording of Plaintiff's conversation with Phillips when he refused to cover Cunningham's night shift plainly shows that he repeatedly talked over Phillips and unequivocally stated (at least initially) that he would not work that particular shift. (Doc. # 29-14). Plaintiff also blamed Phillips and several of his co-workers for his unhappiness with his shift assignments. (*Id.*). Further, the entire conversation took place in front of another jailor/dispatcher, which understandably caused Phillips to conclude Plaintiff had undermined her authority in the presence of a subordinate. (*Id.*). In an attempt to recast this video evidence, Plaintiff asserts that he did, in fact, say he would work an extra four hours on Sunday. (Doc. # 36 at 31-32). But, Plaintiff made this statement at the end of the conversation and only *after* he talked over Phillips and angrily refused to cover the shift. (*Id.*).

Plaintiff also points to Phillips's memorandum to Chief Carter recommending termination. (Doc. # 36 at 30, 35). The memorandum included the following explanation:

> Due to Mr. Watkins obvious gross insubordination, his refusing to work, his slanderous accusations that I intended to hire Derrick Mills so Mr. Watkins couldn't be moved to 1st shift, his undermining my authority by verbally attacking me in front of my subordinate and accusing me slanderously of keeping him off 1st shift and implying that I didn't have the authority to tell him he couldn't work 1st shift, **his obvious paranoia that two white women have been sabotaging his job at Adamsville, Mr. Watkins is obviously unstable and should not be allowed to work in this environment**, my very strong recommendation is termination of employment.

(Doc. # 34-5 at 4) (emphasis added). Plaintiff attempts to make much of the highlighted language. But, that language speaks only to *Plaintiff's* characterization of his treatment during his employment. It does not, as Plaintiff asserts, show that the City had a discriminatory motive (based on *his* race or gender) in ending his employment. *See Holifield,* 115 F.3d at 1565 (noting that the inquiry into pretext focuses on the perception of the employer, not the employee). In other words, this memorandum does not suggest (1) that the City's proffered reason of Plaintiff's insubordination is pretextual or (2) that Phillips recommended termination because Plaintiff is an African-American male. For these reasons, Plaintiff has not met the City's proffered reason (and video evidence) for his termination/resignation "head on and rebut[ted]" it. *Chapman*, 229 F.3d at 1030. As such, the court finds that Plaintiff has failed to provide evidence creating a genuine issue of material fact regarding whether the City's articulated reason is pretextual. *See id.* at 1024-25.

### ii. Plaintiff's Mixed-Motive Discrimination Claims Fail as a Matter of Law

"[A]n adverse employment action motivated by both legal and illegal reasons constitutes actionable discrimination under Title VII." *Quigg*, 814 F.3d at 1236 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). A plaintiff "can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse

employment action, 'even though other factors also motivated' the action." *Quigg*, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e–2(m)). A plaintiff "can prove a mixed-motive case with direct or circumstantial evidence." *Id.* at 1237 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003)). However, it is improper to use the *McDonnell Douglas* framework to evaluate a mixed-motive claim at summary judgment. *Id.* at 1238. Rather, "[t]o avoid summary judgment, a plaintiff raising a mixed-motive claim must offer evidence sufficient to convince a jury that: (1) the [employer] took an adverse employment action against [her]; and (2) a protected characteristic was *a* motivating factor for the [employer]'s adverse employment action." *Bowen v. Manheim Remarketing, Inc.,* 882 F.3d 1358, 1364 (11th Cir. 2018) (quoting *Quigg*, 814 F.3d at 1239) (emphasis in original) (internal quotation marks omitted). "In other words, the court must determine whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [his] protected characteristic was a motivating factor for an adverse employment decision." *Quigg*, 814 F.3d at 1239 (internal quotation marks omitted) (bracketed text omitted).

Here, the Rule 56 evidence does not suggest that Plaintiff's race or gender was a motivating factor for Plaintiff's termination/resignation. Again, Phillips simply recognized Plaintiff's perception that two white women "have been sabotaging his job." That does not suggest, as Plaintiff argues, that *his* "race and gender [were] on Phillips's mind when she recommended termination." (Doc. # 36 at 30). This is particularly evident given the context of Phillips's statement. Phillips began her memorandum recommending termination by listing each factor that led her to believe Plaintiff was insubordinate. (Doc. # 34-5 at 4). Plaintiff's apparent "paranoia that two white women have been sabotaging his job" was the last example in a long list of factors evidencing his insubordination. (*Id.*). Simply stated, Phillips's statement does not indicate that

*Plaintiff's* race or gender motivated either her decision to recommend termination to Chief Carter or Chief Carter's decision to end Plaintiff's employment. Viewed in the context of the entire memorandum and the undisputed Rule 56 evidence, Chief Carter heeded Phillips's recommendation to terminate Plaintiff because he (Plaintiff) was insubordinate. As Plaintiff has failed to provide sufficient evidence for a reasonable jury to conclude that his race or gender was a motivating factor for his termination/resignation from the City, Defendants are entitled to summary judgment on his mixed-motive discrimination claims.

### iii. Plaintiff Has Not Presented a "Convincing Mosaic" of Circumstantial Evidence to Support His Race and Gender Discrimination Claims

Though the parties have not briefed this issue, out of an abundance of caution, the court also considers whether Plaintiff may proceed with his discrimination claims under a "mosaic" theory. In *Smith v. Lockheed-Martin*, the Eleventh Circuit held that a plaintiff does not always have to establish a *prima facie* case under the *McDonnell Douglas* framework to present a triable Title VII claim of unlawful discrimination. 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff can present a triable issue of discriminatory intent through a convincing mosaic of circumstantial evidence from which a reasonable jury could find intentional discrimination by the employer. *Id.* Or, stated in other words, "[a] 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements …, and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Moore v. Pool Corp.*, 304 F. Supp. 3d 1148, 1162 (N.D. Ala. 2018) (quoting *Lewis v. City of Union City*, 877 F.3d 1000, 1018 (11th Cir. 2017), *vacated*, 893 F.3d 1352 (11th Cir. 2018) (*en banc*)).

In *Lockheed-Martin*, the circumstantial evidence presented by the plaintiffs was overwhelming and included: (a) a documented history of disparate treatment of Caucasian and

African-American employees; (b) a spreadsheet listing employees under investigation by name and race that the defendant's disciplinary review committee used to make disciplinary decisions; and (c) a news program reporting the defendant's struggles with racism in the workplace, which focused on violence by a white supremacist. *See id.* at 1329-40. The Eleventh Circuit concluded, among other reasons, that the plaintiffs presented a triable race discrimination claim because the defendant "consciously injected race considerations into its discipline decision making without an adequate explanation for doing so." *Id.* at 1341.

The Rule 56 evidence regarding potential race and gender discrimination in this case falls far short of that presented in *Lockheed-Martin*. Presumably, Plaintiff relies on the list of proposed adverse employment actions cited above to support his argument that the evidence shows a "convincing mosaic" of discrimination. (Doc. # 36 at 29-30). However, as previously discussed, this list amounts to little more than a breakdown of minor disagreements with co-workers and supervisors. The Rule 56 evidence, viewed in the light most favorable to Plaintiff, at most shows that Phillips and Plaintiff did not get along at times, and as a result, their personal relationship bled into her criticism of Plaintiff's job performance. But, even if Phillips criticized Plaintiff's job performance more frequently than she criticized other white female employees, the record does not suggest, as Plaintiff asserts, that Phillips "tried to have [Plaintiff] fired" (much less that she tried to have him fired based on a discriminatory motive).[12] (Doc. # 36 at 31-32). In fact, Phillips only reported the two incidents of insubordination -- following Plaintiff's failure to do the laundry and his heated refusal to cover Cunningham's night shift -- up the chain to Chief Carter (who retained the ultimate authority to suspend or fire an employee). Crucially, there is nothing contained within Phillips's reports of these incidents (nor in any other Rule 56 evidence) that

---

[12] For example, the simple fact that Phillips's criticisms stemmed from Plaintiff's job performance while working with female inmates does not imply that *Plaintiff's* race or gender motivated her actions.

suggests she was motivated by Plaintiff's race or gender in forming her opinion that he was insubordinate. Without some link between Phillips's actions and Plaintiff's race or gender, there is no evidence, outside of Plaintiff's "own conclusory say-so," that would support an inference of race or gender discrimination. *See Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1337-38 (11th Cir. 2015); *see also Turner v. Fla. Prepaid Coll. Bd.*, 522 F. Appx. 829, 833 (11th Cir. 2013) (noting that the plaintiff's allegation that an employer singled her out and treated her poorly does not permit a jury to infer intentional discrimination without evidence linking those actions to the employee's race).

Indeed, the Eleventh Circuit has "never suggested that a plaintiff's generalized averment that [his] employer treated [him] differently than employees of a different race [or gender] can, alone, create a 'convincing mosaic of circumstantial evidence' from which a jury could find intentional discrimination." *Turner*, 522 F. Appx. at 833 (quoting *Smith*, 644 F.3d at 1328). The record evidence does not suggest that any discriminatory reasons motivated (1) Phillips's decision (in her capacity as Plaintiff's direct supervisor) to report his insubordination or (2) Chief Carter's decision to end Plaintiff's employment with the City. Thus, Plaintiff's race and discrimination claims cannot survive summary judgment under any analysis,[13] including a mosaic theory.

---

[13] For these same reasons, the City is due summary judgment on Plaintiff's Section 1983 claims. Although there are various ways to establish municipal liability, Plaintiff argues that the City is liable for Chief Carter's decision to end Plaintiff's employment. (Doc. # 36 at 31-32). Indeed, "[m]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir.2005) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986)). "Only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (quoting *Pembaur*, 475 U.S. at 483)). Plaintiff argues that Chief Carter, who retained the final decision-making authority with respect to Plaintiff's termination, inappropriately relied on Phillips's recommendations and reports, which he believes were motivated by a discriminatory animus. (*Id.*). This argument fails for the reasons discussed in the court's analysis above. To be sure, the Rule 56 record shows that Phillips reported (and thoroughly documented) Plaintiff's insubordinate behavior to Chief Carter on two separate occasions. (Docs. # 29-10; 34-5). Chief Carter reviewed the video evidence of Plaintiff's final insubordinate event and independently determined that his behavior constituted a terminable offense. (Docs. # 29-2 at 13, pp. 46-47; 45-1 at 3). So, even if Chief Carter was a final policy maker, there is no Rule 56 evidence suggesting that he (or the municipality) acted based on any improper motive in implementing the employment actions that Plaintiff perceived as discriminatory or retaliatory.

### B. Defendants Are Entitled to Summary Judgment on Plaintiff's Retaliation Claims

Proceeding under Sections 1981 and 1983, Plaintiff claims that Defendants retaliated against him following his complaints of race and gender discrimination in violation of the First and Fourteenth Amendments. (Doc. # 1 at ¶¶ 85-89, 104-108). As an initial matter, Plaintiff concedes that his "race retaliation" claim in Count Two is due to be dismissed because he never complained to the City about disparate treatment based on his race. (Doc. # 36 at 36). Additionally, the parties agree that Plaintiff's Fourteenth Amendment retaliation claims are due to be dismissed as a matter of law because freedom from retaliation is constitutionally protected by the First Amendment, not the Fourteenth Amendment. (Docs. # 29 at 29; 36 at 48). To be sure, "[t]he right to be free from retaliation is clearly established as a *first amendment* right and as a *statutory* right under Title VII; but no clearly established right exists under the *equal protection* clause to be free from retaliation." *See Ratliff v. DeKalb County*, 62 F.3d 338, 340 (11th Cir. 1995) (emphasis in original). Accordingly, the question the court must consider is whether Plaintiff has established a triable issue of fact with respect to his First Amendment gender-based retaliation claim under Section 1983.[14]

Plaintiff testified during his deposition that he complained to Chief Carter at least three times that males were treated differently than females in the jail/dispatch department. First, when Chief Carter questioned Plaintiff in his office regarding the January 2014 book incident, Plaintiff told Carter that "it's kind of hard to be a male over [in the jail/dispatch department]." (Doc. # 34-

---

[14] Plaintiff devotes a substantial portion of his response brief to analysis of his First Amendment retaliation claim under the *McDonnell Douglas* framework for a Title VII claim of retaliation. (Doc. # 36 at 38-45). However, Plaintiff has not alleged a Title VII claim for retaliation. His only remaining claim is for First Amendment retaliation arising under Section 1983. As such, the court's determination of whether Defendants are entitled to summary judgment on Plaintiff's retaliation claim does not require consideration of the *McDonnell Douglas* burden shifting framework.

1 at 64, pp. 243-244). Second, following Phillips's October 2014 laundry insubordination memorandum, Plaintiff complained to Chief Carter that he did not know "what it's like being a male up in there, we're treated differently." (Doc. # 34-1 at 65, p. 247). Finally, when Plaintiff left his employment on March 30, 2016, he again voiced his concerns that he had been discriminated against based on his gender. (*Id*. at 66, pp. 250-52). Although Chief Carter denies that Plaintiff ever complained to him about being treated differently due to his race or gender (Doc. # 29-2 at 13, p. 47), the court must credit Plaintiff's version of the facts for summary judgment purposes.

Plaintiff argues that the City and/or Phillips retaliated against him because of these complaints in the following ways: (1) reassigning Plaintiff to the third shift two months after the book-throwing incident and his complaint that males were treated differently in his department; (2) instructing Fields and Jameson to watch Plaintiff on the third shift; (3) issuing Plaintiff a memorandum outlining problem areas in his job performance during the night shift; (4) preparing an "insubordination" memo following Cunningham's report that he did not perform his jailor duties during the November 2-3, 2015 night shift, even though the logs show that he worked the jail that evening; (5) reporting Plaintiff for insubordinate conduct following his failure to do the laundry, even though according to Plaintiff, it was impossible to do the laundry because the machine was broken; (6) rescinding Plaintiff's discipline of an inmate; (7) maintaining "false write ups in his personnel file";  (8) reporting Plaintiff for insubordinate conduct when he refused to cover Cunningham's Saturday, March 26, 2016 night shift, even though he offered to work an extra four hours during another shift; and (9) forcing him to resign partially due to his "obvious paranoia that two white women have been sabotaging his job at Adamsville." (Doc. # 36 at 37-38, 43-46).

Defendants argue that they are entitled to summary judgment on Plaintiff's remaining retaliation claim for three reasons. (Doc. # 29 at 31-41). First, Defendants assert that Plaintiff's speech was not constitutionally protected. (*Id*. at 31-36). Second, they contend that there is no culpable policy-maker or city-wide custom or policy allowing municipal liability for Plaintiff's retaliation claims. (*Id*. at 36-38). Finally, Defendants maintain that Phillips is due summary judgment because she was not the "decision-maker" with respect to Plaintiff's termination, and in any event, she is immune to Plaintiff's retaliation claims. (*Id*. at 38-41). The court addresses each argument in turn and concludes that summary judgment is appropriate.

> i. **Defendants Are Entitled to Summary Judgment on Plaintiff's First Amendment Retaliation Claim Because He Has Not Alleged the Deprivation of a Constitutional Right**

It is well-established that a state employer cannot retaliate against a state employee for engaging in speech that is constitutionally protected under the First Amendment. *See Rankin v. McPherson*, 483 U.S. 378, 383 (1987). However, the law recognizes that courts must strike "a balance between the interest of the [employee], as a citizen, in commenting upon matters of public concern, and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968).

Guided by the tests set forth by the Supreme Court in *Pickering v. Board of Education* and *Connick v. Myers*, 461 U.S. 138 (1983), the Eleventh Circuit has developed a four-part test to determine whether an employee has suffered retaliation based on speech protected by the First Amendment. *See Akins v. Fulton Cty., Ga.*, 420 F.3d 1293, 1303 (11th Cir. 2005); *see also Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). An employee must show "(1) that the speech can be fairly characterized as relating to a matter of public concern; (2) that [his] interests

as a citizen outweigh the interests of the State as an employer; and (3) that the speech played a substantial or motivating role in the government's decision to take an adverse employment action." *Id*. If the plaintiff establishes these elements, the burden then shifts to the employer to prove that (4) it would have made the same adverse employment decision absent the employee's speech. *Atkins*, 420 F.3d at 1303; *see also Bryson*, 888 F.2d at 1566. If an employee cannot meet the threshold showing that his speech relates to a matter of public concern, the inquiry is at an end and the court need not address the remaining elements of the claim. *Eggleston v. Bieluch*, 203 F. Appx. 257, 267 (11th Cir. 2006). For the reasons explained below, the court concludes that Plaintiff's First Amendment retaliation claim fails because he spoke as an employee about matters of private interest.

To fall within the realm of "public concern," a government employee's speech must "relate to a matter of political, social, or other concern to the community." *Atkins*, 420 F.3d at 1302 (quoting *Watkins v. Bowden*, 105 F.3d 1344, 1353 (11th Cir. 1997)). Absent extraordinary circumstances, First Amendment protection is unavailable when a government employee speaks in his role as "an employee upon matters only of personal interest." *Connick*, 461 U.S. at 147. The court must therefore determine the purpose of the employee's speech—that is, whether he spoke on behalf of the public as a citizen or for himself as an employee. *Id*. at 146. In so doing, the court must consider "the content, form, and context of the employee's speech." *Bryson*, 888 F.2d at 1565.

Defendants argue that Plaintiff's speech involved nothing more than workplace grievances that do not raise issues of legitimate public interest. (Doc. # 29 at 31-32). The court agrees. For example, in *Morgan v. Ford*, 6 F.3d 750 (11th Cir. 1994), an employee brought a First Amendment retaliation claim after her termination following her complaints to the Superintendent of Internal

Affairs and the Office of Fair Employment Practice about workplace sexual harassment. *Id.* at 755. She did not attempt to involve the public in any manner. *Id*. The court concluded that the employee's speech was not a matter of public concern because her speech "was driven by her own entirely rational self-interest in improving the conditions of her employment." *Id*.

Here, too, the record shows that Plaintiff spoke in his role as an employee seeking to improve his working conditions, not as a citizen drawing attention to a matter of public concern. Plaintiff voiced his concerns to Chief Carter in private internal meetings. Like the plaintiff in *Morgan*, he did not attempt to involve the public in any manner. Although workplace discrimination is generally a matter of societal concern, "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest" should not sway the court's analysis as Plaintiff suggests (Doc. # 36 at 37). *Morgan*, 6 F.3d at 754. Considering the entire record, the court concludes that Plaintiff primarily spoke as an employee in order to remedy his own working conditions. Because Plaintiff has failed to establish that he suffered a deprivation of any constitutional right, Defendants are entitled to summary judgment on his First Amendment retaliation claim.

Although not necessary to its holding, the court briefly addresses the remaining elements of Plaintiff's First Amendment retaliation claim. Even if Plaintiff's speech could be considered a matter of public concern (and, to be clear, it cannot), his First Amendment speech interests do not outweigh the City's interest "in promoting the efficiency of the public services it performs through its employees." *Bryson*, 888 F.2d at 1565. In making this determination, the court considers three factors: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made." *Id.* at 1567. The court also considers "whether the statement impairs discipline

by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. Here, the City's interest in the efficient operation of its Police Department outweighs Plaintiff's interest in complaining about his perception that Phillips treated him unfairly. Plaintiff repeatedly demonstrated a lack of regard for Phillips's authority as his supervisor by talking over her and claiming (in front of another employee) that she did not have the power to reassign him to other shifts. This is particularly true here within the context of a Police Department where the chain of command is crucial for public safety. Plaintiff has failed to satisfy the *Pickering* balancing test.

Next, the court determines that Plaintiff's unprotected speech was not a substantial factor motivating any of the potentially adverse actions noted above. Again, even assuming these actions are considered "adverse" for the purposes of a retaliation claim, there is nothing in the Rule 56 record (other than Plaintiff's conclusory allegations) to suggest that Phillips reassigned Plaintiff to a different shift, issued written critiques about his job performance, or reported his insubordinate behavior to Chief Carter because of Plaintiff's complaints that males were treated differently in the jail/dispatch department. By contrast, the record indicates that Phillips merely acted in accordance with her legitimate duties as Plaintiff's supervisor. In fact, the Rule 56 evidence suggests that Phillips only became aware of his complaints through the final instance of insubordination that resulted in his departure from the City. In her memorandum recommending Plaintiff's termination, Phillips noted his "obvious paranoia that two white women have been sabotaging his job at Adamsville." (Doc. # 34-5 at 4). However, the court concludes that this statement did not form the grounds for Plaintiff's termination because Chief Carter (who made the

ultimate decision to terminate Plaintiff's employment) testified that he reviewed the video evidence and determined from that review that Plaintiff's insubordinate conduct was a terminable offense. (Docs. # 29-2 at 13, pp. 46-47; 45-1 at 3). Consequently, because Plaintiff has failed to demonstrate that he suffered any constitutional violation, Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

### C. Phillips is Entitled to Qualified Immunity on All of Plaintiff's Section 1983 Claims

Because Plaintiff has failed to establish he suffered *any* violation of his rights under Section 1983, the court also finds that Phillips is entitled to qualified immunity. (Doc. # 29 at 22-26, 39-42). Under the doctrine of qualified immunity, public officials performing discretionary functions[15] are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In evaluating whether Phillips is entitled to qualified immunity, the court "must first determine whether [Plaintiff] has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1286 (11th Cir. 2000) (quoting *Wilson v. Layne*, 526 U.S. 603, 609 (1999)). Because Plaintiff has not shown that he suffered a deprivation of *any* right, he has likewise "failed to allege the violation of a clearly established right." *Id*. (internal quotations omitted). Thus, the court is "not required to examine the clearly established law at the time of the offense." *Id*. n. 7 (quoting *Marshall v. Allen*, 984 F.2d 787, 793 (7th Cir. 1993)).

---

[15] Plaintiff has not asserted any argument that Phillips acted outside of her discretionary authority in implementing any of the employment actions at issue. Indeed, any such allegation would be off the mark. In determining whether an official acted within the scope of her discretionary authority, a court should ask "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), and (b) through means that were within [her] power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265-66 (11th Cir. 2004). Phillips acted well within her discretionary duties as Dispatch Supervisor in effectuating such actions as schedule changes, reprimands, and performance evaluations.

Accordingly, all Section 1983 claims against Phillips in her individual capacity are barred by the doctrine of qualified immunity.

Additionally, Phillips was not the "decisionmaker" with respect to Plaintiff's termination. Under Section 1983, only "official decisionmakers," meaning individuals who have "the power to terminate an employee," may be held individually liable. *Kamensky v. Dean*, 148 F. Appx. 878, 880 (11th Cir. 2005). It is undisputed in this case that Chief Carter -- not Phillips -- made the ultimate decision to end Plaintiff's employment with the City. But, Chief Carter is not a named defendant in this action. Although his briefing is unclear, the court understands Plaintiff to argue that Phillips may be held individually liable for either "terminat[ing] or influenc[ing] the termination" of Plaintiff. (Doc. # 36 at 49). In other words, Plaintiff attempts to impose individual liability upon Phillips as the "recommender" under a "cat's paw theory." (*Id*. at 45-46). However, even if the Rule 56 evidence supported that claim (and, to be clear, it does not), the Eleventh Circuit has not extended individual liability to situations where a recommender who is motivated by retaliatory animus wields the cat's paw. *Kopp v. City of Greensboro*, 2016 WL 4435085, at *7 (M.D. Ga. Aug. 18, 2016) (citing *Kamensky*, 148 F. Appx. at 880). Thus, the court cannot find that Phillips, who recommended termination but was not the final decisionmaker, is individually liable under Section 1983.

## IV.    Conclusion

For the reasons explained above, Defendants' Motion for Summary Judgment (Doc. # 29) is due to be granted. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this July 30, 2019.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE